Bonnie CUTRIGHT *v.* STATE of Arkansas
and Tohono O'odham Nation

CA 06-49                                     244 S.W.3d 702

Court of Appeals of Arkansas
Opinion delivered December 6, 2006

[Rehearing denied January 17, 2007.]

*Jeanette Stephens Heimbaugh, P.A.*, by: *Jeanette Stephens Heimbaugh*, for appellant.

*H. G. Foster*, Prosecuting Attorney, 20th Judicial Circuit, by: *C.J. Acklin*, for appellee State of Arkansas.

*Tohono O'odham Nation - Office of Attorney General*, by: *Samuel F. Daughety*, Ass't Att'y Gen., for appellee Tohono O'odham Nation.

ROBERT J. GLADWIN, Judge. Appellant Bonnie Cutright appeals from the Van Buren County Circuit Court's decision granting custody of Alexia and Andria Sanders to Patrick and Virginia Swartz. On appeal, she argues that the circuit court erred by not following the preferential placement guidelines of the Indian Child Welfare Act of 1978 (hereinafter "ICWA") codified at 25

U.S.C. §§ 1901-1963 (2000). Because the circuit court failed to determine that there was good cause to deviate from the preference of the Tohono O'odham Nation (hereinafter "Nation") that the children in question should be placed with their siblings, we reverse and remand for an award of custody of Alexia and Andria Sanders to appellant.

By way of background, Alexia and Andria Sanders are twin sisters (DOB: 01/22/1997), who, along with four[1] of their full siblings: Bobby (DOB: 11/28/90); Ruben (DOB: 11/23/92); Ricky (DOB: 11/3/93); Roxanne (DOB: 6/26/95) were sent to live with appellant in Arkansas by their mother sometime in August 2002. This action was prompted by Ms. Gaspar's concern that the State of Arizona was going to remove them from her custody while she was in prison. Ms. Gaspar contacted appellant, her third cousin, and requested that she come to Arizona to get the children. While there, Ms. Gaspar gave appellant a signed, written statement conveying the guardianship of all six children to appellant.

The six siblings' natural father is Ruben Sanders, who has undisputedly abandoned the children. He is relevant to this case only because he is an enrolled member of the Nation, which automatically qualifies the children for enrollment in the Nation and triggers the applicability of the ICWA in this custody matter.

In late 2002, approximately two months after appellant had obtained custody of the six Sanders children, Patrick and Virginia Swartz[2] met with Ms. Gaspar in Arizona about possibly adopting Alexia and Andria Sanders. They obtained Ms. Gaspar's signature on a purported relinquishment of her parental rights with respect to the twins and had the document filemarked when they returned to Van Buren County. They then obtained custody of the twins with the assistance of Van Buren County law-enforcement officials.

---

[1] Alexia and Andria's mother, Ms. Tina Gaspar, allegedly has at least thirteen children, only two more of whom are full siblings to the children sent to live with appellant: JoJo (DOB: not of record but close in age to her twin sisters and five years old at the time of the final placement hearing) who resides with a great-aunt in Arizona; and Robert (DOB: not of record but the youngest of the siblings at three years of age at the time of the final placement hearing) who resides with Ms. Gaspar's youngest sister in Mississippi. Four of the other half-siblings (who have Juatae Gaspar as a father) had reached the age of majority at the time of this proceeding, and another half-brother, Alex Wood, was adopted by appellant's sister years ago.

[2] Virginia Swartz is a fourth cousin to Ms. Gaspar.

In March 2003, appellant filed a Family in Need of Services Petition (hereinafter "FINS") regarding recent behavior problems with Bobby Sanders, and later added the other children to the petition on April 2, 2003, seeking a determination of custody of all six of the children. The case continued through the course of 2003 and 2004 through May 20, 2005, during which time custody of the twins was left with Mr. and Mrs. Swartz while the other four siblings remained with appellant.

The circuit court was made aware from the outset of the case of the fact that the children are "Indian" children, as defined in the ICWA. Despite letters from the Nation that their preference for the placement of the twins was with appellant and the other siblings, the circuit court granted permanent custody of the twins to Mr. and Mrs. Swartz and the other four children to appellant based upon the best interests of the children and without findings as to the ICWA. This appeal followed.

Generally, in cases involving child custody and related matters, we review the case de novo, but we will not reverse a trial judge's findings in this regard unless they are clearly erroneous. *Bernal v. Shirley*, 96 Ark. App. 148, 239 S.W.3d 11 (2006). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Id.* Because the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest. *Id.* Specifically, there are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carries a greater weight than those involving the custody of minor children, and our deference to the trial judge in matters of credibility is correspondingly greater in such cases. *Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002).

While none of the parties question the above-stated standards of review, they are quick to point out the specific requirements of the ICWA related to custodial issues. The leading case in which the Supreme Court dealt with the ICWA is *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989), in which the purpose of the act was discussed:

> The Indian Child Welfare Act of 1978 (ICWA), 92 Stat. 3069, 25 U.S.C. §§ 1901-1963, was the product of rising concern in the

mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes. Senate oversight hearings in 1974 yielded numerous examples, statistical data, and expert testimony documenting what one witness called "[t]he wholesale removal of Indian children from their homes, . . . the most tragic aspect of Indian life today." Indian Child Welfare Program, Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 93d Cong., 2d Sess., 3 (statement of William Byler) (hereinafter 1974 Hearings).

*Id.* at 32. Congressional findings that were incorporated into the ICWA express the following concerns:

(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . . ;

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901 (2000). Other provisions of the ICWA set procedural and substantive standards for child-custody proceedings that take place in state court, including section 1915, which relates to the placement of Indian children and provides in its entirety:

§ 1915. Placement of Indian children

(a) Adoptive placements; preferences

In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with

(1)  a member of the child's extended family;

(2)  other members of the Indian child's tribe;  or

(3)  other Indian families.

(b)  Foster care or preadoptive placements; criteria; preferences

Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met.  The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child.  In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with —

(i)  a member of the Indian child's extended family;

(ii)  a foster home licensed, approved, or specified by the Indian child's tribe;

(iii)  an Indian foster home licensed or approved by an authorized non-Indian licensing authority;  or

(iv)  an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

(c)  Tribal resolution for different order of preference; personal preference considered; anonymity in application of preferences

In  the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section.  Where appropriate, the preference of the Indian child or parent shall be considered: Provided, That where a consenting parent evidences a desire for anonymity, the court or agency shall give weight to such desire in applying the preferences.

(d)  Social and cultural standards applicable

The standards to be applied in meeting the preference require-
ments of this section shall be the prevailing social and cultural
standards of the Indian community in which the parent or extended
family resides or with which the parent or extended family mem-
bers maintain social and cultural ties.

(e) Record of placement; availability

A record of each such placement, under State law, of an Indian
child shall be maintained by the State in which the placement was
made, evidencing the efforts to comply with the order of preference
specified in this section. Such record shall be made available at any
time upon the request of the Secretary or the Indian child's tribe.

None of the parties dispute that the ICWA applies in this case, but
how the placement preferences apply in this situation constitutes the
pivotal issue to be resolved. Regarding the placement preferences, it
is undisputed that appellant is a third cousin of Ms. Gaspar and Mrs.
Swartz is her fourth cousin. The brief submitted by the Nation plainly
states that neither the Swartzes nor appellant meet the ICWA's
definition of "extended family" under sections 1903 and 1915, and
neither party provided any proof or documentation of Indian ancestry
despite both claiming to have some Indian blood. Additionally, no
other potential Indian placements were identified for the children.
Accordingly, the issue with regard to the placement preference must
be based on section 1915(c), which states that, "[i]n the case of a
placement under subsection (a) or (b) of this section, if the Indian
child's tribe shall establish a different order of preference by resolu-
tion, the agency or court effecting the placement shall follow such
order so long as the placement is the least restrictive setting appropri-
ate to the particular needs of the child, as provided in subsection (b) of
this section."

The Nation, or tribe, initially stated in its letter dated June
22, 2004, that its preference for the placement of the twins was
with appellant, "provided there is nothing in the evaluation of the
home environment that would put the children at risk if returned
to this family." In support of that recommendation, the Nation
explained in its brief filed with this court that "[t]he only family
the children have in Arkansas are each other, and their placement
together is the closest approximation of placement with 'extended
family' intended by the Act."

The instant case is clearly not the situation debated with
respect to the enactment of the ICWA, where discussion centered

around the grave concern over harm to Indian parents and their children who were involuntarily separated by decisions of local welfare authorities, as well as the impact on the tribes themselves of the massive removal of their children. These children's father, their direct tie to the Nation, had abandoned them and was not involved in this case at all.

None of the parties seeking custody of the children fell within the parameters covered by the ICWA preferences, and based on the record before us, appear to be equally ill-equipped to seriously impart the Nation's heritage and customs to the children. Specifically, Mr. Swartz testified at the final placement hearing that, although he could not pronounce the name of the Nation and was unaware of the primary religion, he and his wife were educating the twins in Indian culture. He testified that they want them to learn the language, that his wife did research on the Internet and contacted a tribal member to obtain some CD's, and has taught them some information about the Nation's language and heritage based on that information. The only other evidence he presented was that his wife had always decorated their home with Southwestern items such as blankets, pottery, Indian pictures hanging on the walls, etc. He admitted that they had not attempted to enroll the twins in the Nation, although they had contacted Valerie Geronimo in Sells, Arizona, an official with the Nation, a couple of months after obtaining custody of the twins and spoke with her brother, Ronald Geronimo. He explained that they referred them to Dana Thomas at the Venito Garcia Library in Sells, Arizona, who advised that they go to the Internet for information. It is undisputed that they did not maintain contact with Ms. Geronimo or other members of the Nation throughout the course of this case based on advice from their attorney at the time.

Appellant does not fare much better. She testified that she takes the children to the library to learn about their heritage and has a primary contact at the Indian Nation named Kathleen Carmen. Appellant testified that Ms. Carmen has provided information to her regarding the Nation, and appellant stated that she also keeps Ms. Carmen updated on the children's progress. Appellant explained that she has been discussing enrollment papers for the children for quite some time but has been informed that it is a lengthy process involving tribal authorities. She did indicate that she knows that the primary religion of the Nation is Catholic but did not indicate that the children are being raised in the faith. She

described taking them through the Nation to go down to Mexico on a trip. To her credit, appellant does appear to be in closer contact with the relatives that have custody of the other two full siblings than the Swartzes.

██ While both parties in this matter are on equal footing when it comes to the preferences set out in subsections 1915(a) and (b), appellant entered the final placement hearing with the advantages of having four of the twins' full siblings in her custody and remaining in closer contact with the Nation throughout this case. The Nation clearly and repeatedly states that its preference is for all six of the siblings to be together with appellant, "provided there is nothing in the evaluation of the home environment that would put the children at risk if returned to this family." We hold that the Nation's recommendation for placement was sufficient to invoke the preference set out in subsection 1915(c).

The question then becomes whether under section F.3 of the Bureau of Indian Affairs's Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67584 (Nov. 26, 1979), the circuit court had "good cause" to modify the preferences, specifically the requested placement preference of the Nation. Section F.3 states:

> a. For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference set out above *shall* be based on one or more of the following considerations:
>
> (i) The request of the biological parents or the child when the child is of sufficient age.
>
> (ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.
>
> (iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.
>
> b. The burden of establishing the existence of good cause not to follow the order of preferences established in subsection (b) shall be on the party urging that the preferences not be followed.

(Emphasis added.) According to the guidelines, the burden to prove "good cause" to modify the preferences is on the Swartzes because

they are the ones seeking to avoid the Nation's recommendation for placement of the twins. Relying on subsection (a)(i) is questionable because, although they obtained some type of relinquishment of rights document from the children's mother subsequent to her granting guardianship to appellant, the legitimacy of that entire process was unclear. There was no specific finding made by the circuit court as to Ms. Gaspar's final request, and there is evidence that she chose to place her children with both parties at different times.

As for subsection (a)(ii), it does not appear that anyone argued that the twins had *extraordinary* physical or emotional needs that could be met by the Swartzes but not by appellant. There was testimony from Dawn Harris, a psychologist from Jacksonville, Arkansas, that she definitely believed that there could be damage to the girls if they were removed from the Swartzes, that they would definitely need counseling, and that there could be a long-term lack of trust in people in their lives. This related to the "bonding" issue in the case, which was very contentious when viewed with respect to the ICWA. There was also an issue as to whether Ms. Harris was a "qualified expert witness" with respect to the guidelines due to her admission that she has no experience providing services to Indian children, is unfamiliar with Indian communities, amenities, and culture.[3] Related to subsection (a)(iii), it appears that no other suitable families for placement were found that met the preference criteria; however, it is difficult from the record before us to determine how diligent a search was completed to look for such families.

The Nation appears to base its recommendation solely on keeping the siblings that can be together in the same immediate "family," irrespective of the fact that other full and half-siblings are scattered among several other states. While the children will likely only learn the traditions and information about their heritage that is imparted to them by their guardians for the immediate foreseeable future, they are each other's only viable link to the Nation. It will likely be many years, when they are closer to adulthood, before they might seek out such information and

---

[3] However, the Washington Supreme Court in *In re Mahaney*, 51 P.3d 776 (Wash. 2002), interpreted the ICWA to allow testimony from expert witnesses with specialized training for children's medical psychological, and special needs, despite such experts' lack of special knowledge of and sensitivity to Indian culture where expert testimony did not inject cultural bias or subjectivity.

traditions on their own, but the Nation values that family unit and appears to advocate that they will be one step closer if that familial bond is maintained.

The circuit court disregarded the ICWA preferences, specifically the recommendation of the Nation, and relied solely on the general "best interest" standard. As the State points out in its brief, a uniform standard has been carved out pertaining to custody proceedings involving children covered under the ICWA. The standard is more involved than the normal "best interest" standard. This standard mandates certain presumptions, placements and findings in placing an Indian child. These standards are applied to the states through federal law and regulations, constitutional requirements, various treaties, preceding case law, as well as other legal and equitable principles. This heightened standard not only seeks to place the covered child in a loving environment, which is a paramount concern in every child-custody situation; but also to protect the child, the child's culture and knowledge thereof, the child's self-image, as well as other considerations designed to maintain the national and tribal heritage within the child and the child's relationship with that heritage.

█ The decision of the circuit court may not have been reversible within the application of the "best interest test of the child" as the test is normally applied, and taking into account the special deference we give to the superior position of the trial judge in child-custody matters. That said, the "best interest test of the child" is not the only issue in this case. The test is somewhat different when applied to children covered by the ICWA. The State, the Nation, and one of the attorneys ad litem all point out that the ICWA placement preferences should be followed absent good cause as defined by section F.3 of the BIA Guidelines. The theory is that the "best interest test" should be weighed against the standard of maintaining the integrity of the Nation, its culture, its children, and its progression through time not to become extinct. The circuit court even stated on the record that "[w]hat the guidelines of ICWA requires me to do is either keep the children together or find a compelling overriding interest not to." The circuit court then moved to a straight best interest analysis and failed to make findings related to whether there is "good cause" to disregard the Nation's recommendation to place the twins with their siblings in appellant's custody. Accordingly, the findings of the circuit failed to comply with the requirements of the ICWA,

and we hold that they were clearly erroneous. We reverse and remand this matter for an award of custody of Alexia and Andria Sanders to appellant.

Reversed and Remanded.

BIRD and ROAF, JJ., agree.